# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1749-24

K.A.-B.,[1]

    Plaintiff-Respondent,

v.

M.J.B.,

    Defendant-Appellant.

_____

Submitted March 25, 2026 – Decided July 14, 2026

Before Judges Currier and Smith.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Middlesex County, Docket No. FV-12-1078-25.

Latsko Family Law LLC, attorney for appellant (Jamie L. Latsko, on the briefs).

Brause, Brause & Ventrice, LLC, attorneys for respondent (Peter Ventrice, on the brief).

---

[1] We use initials to protect the parties' privacy and the confidentiality of these proceedings. R. 1:38-3(d)(10).

PER CURIAM

Defendant M.J.B. appeals from a January 9, 2025 final restraining order (FRO), which was entered pursuant to the Prevention of Domestic Violence Act (PDVA), N.J.S.A. 2C:25-17 to -35.  Defendant contends the trial court abused its discretion on several evidentiary rulings and erred in finding plaintiff K.A.-B. proved the predicate acts of criminal mischief and harassment.  Because the court's findings were supported by adequate, substantial evidence, including testimony it found credible, we affirm.

I.

After plaintiff obtained a temporary restraining order (TRO) against defendant in November 2024, the court conducted a trial over two days in January 2025, at the conclusion of which the court granted plaintiff an FRO.  We derive the following facts from the trial.

Plaintiff and defendant have been married since November 29, 2008.  They have twins—E.B. and N.B., born in August 2012.  Following the entry of the FRO, plaintiff filed a complaint for divorce.

On November 23, 2024, plaintiff called police regarding a domestic violence incident at the parties' residence.  Officer Gerald Charles responded to the call and testified that when he arrived at the residence, he saw plaintiff and

N.B. standing outside. Defendant was inside the house, cleaning up broken items and spilled garbage in the kitchen. Charles testified that when he first arrived on scene he "could tell [plaintiff] was scared" and that was "why [he] went inside . . . to figure out what[ was] going on."

In speaking with defendant, Charles smelled alcohol and stated that defendant "appeared to be intoxicated" and was "slurring [his] words." Charles testified that his supervisor made "the determination that [the officer should] detain . . . defendant" and arrest him for criminal mischief. After informing defendant he was going to be charged and arrested, defendant became "very agitated" and "started yelling things."

Plaintiff's Testimony

Plaintiff testified that after defendant was arrested for criminal mischief, one of the officers asked her to pack a bag for defendant and leave it outside. She stated that she went to the basement to get a backpack and found an empty bottle of whiskey, a bottle of whiskey about an eighth full, and a shot glass next to it on defendant's desk. Plaintiff conceded she did not observe defendant consuming the bottle of whiskey nor did she know if he consumed it that day.

A-1749-24

Plaintiff testified that on the day of these events she was at a swim meet with the children all afternoon. On their way home, at approximately 7:40 p.m., the children called defendant and asked him to pick up some takeout food.

Plaintiff and the children arrived home first. Shortly thereafter, defendant "arrived home with the food, put it on the [kitchen] island and [then] went back into the living room where he was drinking wine." According to plaintiff, defendant told her that she does not clean enough, that he is the "sole provider," and that she doesn't do "anything." Plaintiff said that N.B. then "mumbled something underneath his breath." Plaintiff admitted that she did not hear what N.B. said, "but in the past when [defendant] start[ed] yelling, screaming at me [N.B. would] say something like mom works hard, mom takes care of us." On this night, defendant "screamed at [N.B.]," asked him what he said and then "lunged at him." Plaintiff testified that she was "fearful" defendant would harm N.B. because defendant had put his hands on N.B. in the past. Plaintiff told N.B. to leave the kitchen and go into the dining room.

Plaintiff testified that she followed N.B. into the dining room and then defendant "charge[d]" at her. Plaintiff took out her phone and told defendant she was going to call the police. She believed he was intoxicated because of the words he was using when talking to her.

4

Plaintiff alleged that defendant was referring to her in a disparaging manner in front of the children, calling her a "moron" and "a friggin idiot." Defendant told plaintiff and the children that plaintiff "should be cleaning five days a week" and that "she doesn't do enough." Plaintiff stated that she took the children upstairs to eat the rest of their dinner.

Plaintiff then heard "things just breaking in the kitchen" and later discovered the garbage cabinet drawer was "ripped out of the kitchen cabinet and destroyed." The garbage was spread all over the floor and defendant was pushing it outside and down the back steps. Plaintiff testified she was worried about "how bad . . . it [was] going to get tonight" and decided to call the police. Plaintiff stated there have been incidents like this for ten years but "within the last two years . . . it's almost every [weekend] to every other weekend."

Plaintiff also testified about another incident that occurred in September 2024 when defendant began driving erratically in a parking lot, cutting off other drivers, and "whipping like back and forth" between parking aisles and through other cars in the lot. Plaintiff stated the children were screaming and her glasses fell off after she went "flying forward." Later that day, N.B. told plaintiff that his "side hurt" and when plaintiff told defendant about the child's complaint, defendant responded that she and the children "deserved it."

A-1749-24

Plaintiff also discussed another occasion when defendant intentionally bumped into her when they were in the kitchen. After she complained about it, defendant started screaming at her and "raging." She said defendant went outside and threw a patio chair at some potted plants the children had bought with their own money, leaving the children "heartbroken."

Plaintiff testified that when she says defendant is "raging" it means he is screaming and cursing and has unpredictable conduct. Plaintiff stated that when defendant drinks alcohol he is "[a]ngry," "destructive," "verbally abusive," and acts "aggressive[ly] towards [N.B.]," causing the rest of the family to "fear him." Plaintiff said that in the past, defendant had "picked [N.B.] up by his face and flung him around." Defendant told plaintiff he had "blacked out" and didn't remember doing it. Plaintiff also testified that defendant had "thrown balls at [N.B.'s] face intentionally and left marks."

According to plaintiff, defendant promised her that he would not drink hard alcohol again and if he did or if he put his hands on anyone again, that he would agree to leave. Plaintiff had asked defendant for a separation, but he said "no."

Plaintiff testified she needed the FRO because she believes that defendant is going to punish her "for finally calling the police." Plaintiff stated defendant

6

was going to hurt and torture herself and the children. Plaintiff also referenced defendant making comments about obtaining a gun but her testimony on this is incomplete in the transcript as marked "indiscernible."

Plaintiff also testified about the family's financial arrangements. She said she must ask defendant for permission before she writes a check and to know the balance in the bank account. Plaintiff stated that defendant gives her cash and a credit card but yells and punishes her when he thinks she spent too much. Plaintiff was only permitted to use the credit card for food, the children's clothes, and for approved activities, but the charges had to be sanctioned by defendant.

Plaintiff testified that while the TRO was pending, defendant emailed and texted her early in the morning to scrutinize certain credit card charges and threatened to cancel the card if she did not respond by a specified timeframe.

Defendant's Testimony

Defendant testified that the disagreements between the parties are most often "related to the children's activities, food shopping, [and] more generally [the] division of household responsibilities and tasks." According to defendant, on November 23, 2024, plaintiff had given him a list of "[nine] or [ten] tasks" for him to do that Saturday, which he "set [out] about doing . . . beginning around

A-1749-24

8:00 or 8:30 that morning." He stated he also had half a dozen of his own tasks that he wanted to get done.

While the family was at the swim meet, defendant "completed all but one task," which was cleaning the front of the kitchen cabinets. He had dinner and "was starting to relax with the dog watching a movie." When his daughter called asking him to pick up dinner, he ordered the food and then walked to pick it up.

Defendant testified that he returned home with the food and plaintiff and the children returned approximately fifteen minutes later. When plaintiff came into the house, defendant said she "raise[d] her voice and start[ed] complaining about [him] not having vacuumed the kitchen cabinet faces." Defendant said he was "taken aback and annoyed that after . . . working all day on [the] variety of tasks that . . . is the first thing that she approached [him] with upon returning."

Defendant stated that plaintiff "initiated [the] altercation." He denied bumping or brushing past plaintiff and said that their son was not "mumbling under his breath." Defendant testified that the children were not involved. According to defendant, when he opened the garbage to throw something out, he saw the food that he had brought home was in the garbage. Defendant testified that it is "one of [plaintiff's] MO's when she's upset about something is to take anything, especially any food . . . on the counter, [or] table, and throw it

8

A-1749-24

out."  Defendant stated that he became upset and "yanked on the cabinet drawer, breaking it and spilling some contents onto the kitchen floor."

Defendant admitted he has argued with plaintiff while drinking but stated that "at times" both of them are drinking when the arguments occur.  Defendant testified that most arguments "begin with [plaintiff] complaining at [him] about something that wasn't done to her satisfaction.  These arguments can occur whether or not we've been drinking and they're . . . almost always done in the presence of the children . . . ."  Defendant testified that he has "on more than one occasion suggested that [they] both stop drinking and maintain a dry household to avoid these . . . types of situations" but plaintiff "refuses and says that [defendant's] the one with the problem and not her."

Defendant testified that plaintiff "tends to have wine every evening" and his own drinking depends on his work schedule.  Defendant denied drinking to the point of "extreme intoxication."

When asked about grabbing plaintiff's arms and causing bruising in the past, defendant said he was "simply defend[ing him]self" and put his "hands up to just block her arms, which were raised above her head to strike [him]."  When plaintiff came at defendant a second time, he "caught her arms in the same position and . . . pushed her back slightly . . . to help . . . diffuse the situation."

A-1749-24

As to plaintiff's allegations that defendant lifted N.B. by his chin, defendant stated that when his son was younger he would swing N.B. around the room to songs and that on this particular occasion one of his hands unintentionally "slipped from under [N.B.'s] armpits where you would naturally go grab your child to lift them up and it . . . grazed him [and] it struck him a bit in the chin."

In addressing plaintiff's allegations regarding his treatment of N.B., defendant said that the

> event that [he] think[s] that [plaintiff's] referring to is a fairly recent incident where [N.B.] was behaving [insolently], talking under his breath, answering back when [plaintiff] was . . . taking his electronic devices from him because he had run out of time on them and he wasn't supposed to be on it.

Defendant testified that he was trying to curb this behavior and told N.B. that he "better knock it off," blocked N.B.'s path to prevent him from storming out of the kitchen and put his hand out to stop him from doing so. Defendant stated that as this was going on, plaintiff "slammed" into him from the left, causing defendant to "bang[] into the refrigerator like a linebacker just hit [him]."

In discussing the parties' finances, defendant stated that plaintiff "has had regular access to [a] checkbook and a joint credit card, one issued in both

10

names." Defendant asserted that plaintiff "has chosen to rely on [him] to manage the majority of the family finances for all these years." Defendant further stated that plaintiff "has ready access to that [credit card] for expenditures and she is not required to, and never has, asked [him about] . . . every transaction. Certain things are discussed."

Defendant also testified to disparaging comments plaintiff has made to him "[b]oth verbally" and through "text message," telling defendant he "failed [his] daughter," he is "a loser," and using curse words. He recounted plaintiff calling him "white trash, asshole, a narcissist, [and] selfish" during arguments.

Defendant testified that plaintiff "refuses to allow [their] children to . . . travel with [him] to see [his] family. [Plaintiff] refuses to go with us if [defendant] suggest[s they] go visit members of [his] family who live nearby." Defendant said the children "haven't seen their grandparents since they were four. So[,] it's [been] eight years. They haven't seen their cousins and uncle in about the same period of time." Defendant testified that he has never stopped plaintiff from seeing her family nor stopped her family from seeing the children.

Defendant contested the alleged erratic driving incident in the parking lot, saying he was reacting to a car backing up into the driving aisle as defendant was driving through the lot. Defendant stated he had to "hit the brakes abruptly"

11

which "did throw everybody forward a bit." Defendant acknowledged that he was annoyed and then "reverse[d] a bit abruptly" and put the car in drive "a bit abruptly" before driving toward the exit. Defendant denied telling his family they deserved that.

Defendant also discussed the incident when he threw a patio chair into some plants. Defendant testified he was getting ready to grill outside when plaintiff "start[ed] making comments about [defendant] taking over the kitchen." Defendant stated that he became "aggravated," there was a chair in his path to get to the grill, and "out of aggravation [he] . . . without looking . . . just flung it to the left." Defendant stated that he "repotted the plants either later that day or the next day." Defendant noted that "some of the plants" were purchased by his children, but others were bought by defendant.

## II.

In its oral decision issued January 8, 2025, the court found "plaintiff [w]as . . . extremely emotional" which it found to "be a genuine emotion, not a contrived emotion for the benefit of the court." The court described plaintiff's voice as "fall[ing] off often when . . . she feels a sense of shame in trying to explain how this happens." The court found plaintiff's "demeanor [was] entirely

A-1749-24

consistent with that of . . . an individual that has been beaten down."  The court

found plaintiff's testimony "to be credible, consistent and corroborated."

In assessing defendant's credibility, the court stated:

> I find defendant's demeanor during the testimony of
> . . . plaintiff to be telling.  He would glare at her and he
> often would shake his head, I don't want to say
> violently, but it was rather vigorously from side to side
> disagreeing, and he would look away and roll his eyes.
>
> When on the witness stand himself[,] as the
> court[] noted[,] . . . defendant was often combative and
> aggressive when it was entirely inappropriate for him
> to be so.  But it tells the court how easily he is prone to
> resort to that aggressiveness.  And that's how he
> testified, aggressively.  Every . . . incident had a but this
> is what she did, every incident.
>
> I find . . . defendant does in fact have . . . an
> interest in the outcome of this trial, and I find that . . .
> his interest in the outcome of the trial in fact led to him
> testifying in a manner with an intent to deceive this
> court.
>
> I find his testimony to be unreasonable.
>
> Specifically, I find that every single "but she did
> this" to be instructive to the court not only determining
> his own credibility but . . . his tacit agreement that he is
> in fact as he said unguarded, that he, as he said, an
> unguarded fashion, that it "enrages me" oops, sorry,
> angers me, correction.  I think he had it right the first
> time, enraged.

In short, the court found defendant's testimony incredible.

A-1749-24

In considering Officer Charles, the court found his testimony credible. The court noted Charles stated defendant appeared intoxicated, which was "consistent with what . . . plaintiff" said and "inconsistent" with defendant's testimony and what was depicted in a video[2] of the incident.

The court then turned to the predicate acts alleged in the TRO: harassment and criminal mischief. In considering harassment, N.J.S.A. 2C:33-4, the court stated:

> [U]nder that statute a person commits a petty disorderly person's offense of harassment if that person makes or causes to be made one or more communication anonymously or at extremely inconvenient hours, which is not the case here, in offensively [coarse] language, which is not the case here, although I find the language to be inappropriate. I don't find that it is offensively [coarse]. But I do find that it was uttered in a manner that was likely to cause annoyance or alarm, that . . . defendant specifically used the words that he used, acted in the manner that he did specifically with the intent to cause . . . plaintiff annoyance and alarm.
>
> I do also find that under subsection E that . . . defendant did in fact subject another, in this case . . . plaintiff, to striking, kicking, shoving or other offensive touching or threatens to do so.
>
> I find that . . . by viewing [the video] that . . . defendant in fact was not charging but . . . was carefully positioning himself . . . in a threatening manner so as to

---

[2] The video was marked and admitted as P-4.

A-1749-24

cause . . . plaintiff . . . to remain on the opposite side of the table at all times. And I believe that that was a credible threat, that there was a possibility of physical harm befalling her, or under subsection C, engages in any other course of learning [sic] conduct or of repeatedly committed acts with the purpose to alarm or seriously annoy such person. I do find that this is consistent [with] acts that have occurred over a long period of time. Unfortunately, I agree with . . . defendant and have to accept his testimony that it's happened for at least two years and perhaps more.

As to criminal mischief, the court stated: " [A] person is guilty of criminal mischief if under [N.J.S.A. 2C:17-3(a)(1) they] purposely or knowingly damage[] tangible property of another, which I do find it to be the case here." The court found plaintiff had presented sufficient evidence to establish the offense of criminal mischief.

Having found the commission of two predicate acts of domestic violence, the court considered "whether there is an immediate danger to person or property that warrants the issuance of a[n FRO]." The court noted "there are a number of prior acts of domestic violence that seem to be consistent with the acts that took place that day. This is controlling, manipulative behavior, but also bullying in nature." The court also found there was "a heightened possibility of violence being perpetrated and property being damaged that belonged to" plaintiff and

15

the children when defendant was drinking. In addition, the court found "an element of financial coercion."

The court concluded after assessing the required factors under N.J.S.A. 2C:25-29(a)(1) to -(a)(6) that "plaintiff's life, health and well-being have been and are endangered by . . . defendant's acts." Therefore, the court found the entry of an FRO was necessary for plaintiff's protection.

III.

On appeal, defendant contends (1) the trial court misapplied the rules of evidence in allowing plaintiff's counsel to introduce Exhibit P-4 for the purpose of impeachment; (2) the trial court abused its discretion in restricting questioning by defendant's counsel on certain issues; (3) the trial court abused its discretion in finding that texts sent from plaintiff to defendant were not abusive while essentially the same communications from defendant to plaintiff were deemed abusive; (4) the trial court incorrectly applied the facts to reach its decision and included incorrect recollection and mischaracterization of defendant's testimony; (5) the trial court incorrectly applied the facts as to impeachment of plaintiff's testimony; (6) the trial court erred in finding a violation of N.J.S.A. 2C:17-3 when the evidence did not satisfy each of the

16

elements of the statute; and (7) the trial court erred in relying on P-4 to find an act of harassment under N.J.S.A. 2C:33-4.

"We defer to a trial court's evidentiary ruling absent an abuse of discretion." State v. Garcia, 245 N.J. 412, 430 (2021). Under that deferential standard, we "review a trial court's evidentiary ruling only for a 'clear error in judgment.'" State v. Medina, 242 N.J. 397, 412 (2020) (quoting State v. Scott, 229 N.J. 469, 479 (2017)).

During trial, plaintiff sought to admit P-4, a video depicting part of the November 23, 2024 incident. Specifically, it showed the parties in the dining room. During defendant's direct testimony, he testified he did not follow plaintiff and they were just having an argument. He further explained that, as the argument continued, "plaintiff had retreated or had gone the other direction to take the children out of the room," while he remained in the kitchen, away from plaintiff. Defendant recalled that plaintiff was not present in the room when he "yanked on the cabinet drawer, breaking it and spilling some contents onto the kitchen floor." During cross-examination, defendant reaffirmed that he did not follow plaintiff or the children on the date of the November 23, 2024 incident. In response, plaintiff produced P-4 to impeach defendant's testimony regarding the events.

On the video defendant remains in the dining room and calls plaintiff a "moron," "a friggin idiot" and repeatedly states she should be cleaning the house every day while he works and the children are at school. After seeing the video, defendant agreed it contradicted his direct testimony. We are satisfied P-4 was relevant extrinsic evidence properly admitted under N.J.R.E. 607 to impeach defendant's testimony. Once admitted, the court properly considered it in making the determination whether a predicate act was proven.

Our review of this and the other evidentiary issues asserted by defendant on appeal reveals the court did not abuse its discretion. We conclude the remaining arguments regarding evidentiary issues lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

We turn to defendant's contentions regarding the court's findings as to predicate acts of domestic violence and plaintiff's need for the protection of an FRO.

"In [our] review of a trial court's order entered following trial in a domestic violence matter, we grant substantial deference to the trial court's findings of fact and the legal conclusions based upon those findings." J.D. v. A.M.W., 475 N.J. Super. 306, 312-13 (App. Div. 2023) (quoting N.T.B. v. D.D.B., 442 N.J. Super. 205, 215 (App. Div. 2015)).

"We defer to the credibility determinations made by the trial court because the trial judge 'hears the case, sees and observes the witnesses, and hears them testify,' affording it 'a better perspective than a reviewing court in evaluating the veracity of a witness.'" Gnall v. Gnall, 222 N.J. 414, 428 (2015) (quoting Cesare v. Cesare, 154 N.J. 394, 412 (1998)). A judge's legal conclusions are reviewed de novo. Rowe v. Bell & Gossett Co., 239 N.J. 531, 552 (2019).

The entry of an FRO under the PDVA requires the trial court to make certain findings pursuant to a two-step analysis delineated in Silver v. Silver, 387 N.J. Super. 112, 125-27 (App. Div. 2006). Initially, the court "must determine whether the plaintiff has proven, by a preponderance of the credible evidence, that one or more of the predicate acts set forth in N.J.S.A. 2C:25-19(a) has occurred." Id. at 125 (citation reformatted) (citing N.J.S.A. 2C:25-29(a)). Harassment and criminal mischief are among the predicate acts included in N.J.S.A. 2C:25-19(a). See N.J.S.A. 2C:25-19(a)(10), (13). Second, the judge must determine "whether a restraining order is necessary . . . to protect the" plaintiff from immediate harm or further acts of violence. Silver, 387 N.J. Super. at 127.

A person commits harassment "if, with purpose to harass another," he or she:

(a) Makes, or causes to be made, one or more communications anonymously or at extremely inconvenient hours, or in offensively coarse language, or any other manner likely to cause annoyance or alarm;

(b) Subjects another to striking, kicking, shoving, or other offensive touching, or threatens to do so; or

(c) Engages in any other course of alarming conduct or of repeatedly committed acts with purpose to alarm or seriously annoy such other person.

[N.J.S.A. 2C:33-4(a) to (c).]

We have detailed the testimony the court found which supported the finding of harassment. Plaintiff presented multiple incidents of conduct that amply demonstrated defendant's purpose to harass and annoy her. Both parties agreed the arguments, name-calling, and harassing acts had occurred for years. We are satisfied the court properly considered the totality of the circumstances and found the harassment statute was violated. See Cesare, 154 N.J. at 404. Moreover, a "finding of a purpose to harass may be inferred from the evidence" and a court may use its common sense and experience to "inform that determination." J.D. v. M.D.F., 207 N.J. 458, 477 (2011) (quoting State v. Hoffman, 149 N.J. 564, 577 (1997)).

In addition, the court found plaintiff also established the predicate act of criminal mischief, a finding amply supported by plaintiff's and defendant's

20

testimony. Defendant testified he was upset with plaintiff and yanked out the cabinet drawer, breaking it, and strewing garbage all over the kitchen. The broken drawer was depicted in the photographs admitted into evidence. Plaintiff has demonstrated defendant knowingly damaged tangible property.

The court also determined plaintiff required the protection of an FRO. The court noted the responding officer observed plaintiff was fearful of defendant, and plaintiff expressed her need for the FRO because of her fear of him hurting her and the children.

We are satisfied the issuance of the FRO against defendant is supported by substantial credible evidence in the record.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

A-1749-24